UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-33915-BKC-AJC

IN RE:

CARLOS CARDENAS and
MARGARITA MIRALLES,

Debtors.
_____________________________/

EVIDENTIARY HEARING

MOTION TO VALUE AND DETERMINE SECURED STATUS OF LIEN ON REAL PROPERTY HELD BY WELLS FARGO BANK, NA (35)

March 21, 2012

The above-entitled cause came on for hearing before the HONORABLE A. JAY CRISTOL, one of the Judges sitting in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 51 Southwest 1st Avenue, Miami, Dade County, Florida on Wednesday, March 21, 2012, commencing at or about 2:00 p.m., and the following proceedings were had:

Reported By: Maggie Rubio, RPR

APPEARANCES:

SANDRA NAVARRO GARCIA, P.A., by
SANDRA NAVARRO GARCIA, ESQUIRE
7951 Bird Road, Suite 202
Miami, Florida 33155
On behalf of the Debtors

GERARD M. KOURI, JR, P.A., by
GERARD M. KOURI, JR., ESQUIRE
5311 King Arthur Avenue
Davie, Florida 33331
on behalf of Wells Fargo

_ _ _ _ _ _ _

INDEX


| Witness | Direct | Cross | Redirect |
|---|---|---|---|
| NELSON ROQUE | | | |
| (by Ms. Garcia) | 5 | | 42 |
| (by Mr. Kouri) | | 26 | |
| ERNST MOMPREMIER | | | |
| (by Mr. Kouri) | 46 | | 100 |
| (by Ms. Garcia) | | 80 | |


EXHIBITS


| DEBTORS' | DESCRIPTION | PAGE |
|---|---|---|
| No. 1 | Appraisal | 5 |
| WELLS FARGO'S | DESCRIPTION | PAGE |
| A | Appraisal | 5 |

(Thereupon, the following proceedings were had:)

THE COURT: Carlos Cardenas.

MR. KOURI: Good afternoon, Your Honor. Gerard Kouri on behalf of Wells Fargo.

MS. GARCIA: Good afternoon, Your Honor. Sandra Garcia on behalf of Carlos Cardenas and Margarita Miralles.

MR. KOURI: Judge, both debtors' attorney and myself have had an opportunity to talk and try to narrow this down for Your Honor and if you could give me just a few minutes before we bring the appraisers up to testify, we can tell you how we've narrowed it down.

THE COURT: Surely.

MR. KOURI: First, the subject property, Your Honor, has an address of 639 West 14 Street, Hialeah, Florida 33010. We are here on debtors' motion to value, which is DE 35.

Wells Fargo holds a second mortgage on that property. The property is the debtor's wife's principal residence. What debtor is attempting to do is strip off the Wells Fargo mortgage. The Wells Fargo mortgage -- there is a proof of claim supporting that mortgage and that can be found at 11-2, filed on November 2, 2011, timely filed, in the amount $106,434.

The first mortgage on this property did not file a proof of claim. The first mortgage lender is Ocwen. Ms. Navarro has provided me with a statement on or about the

bankruptcy filing date of August 29, 2011 and that statement shows a principal balance of $104,124.55. We only have two witnesses here today, Your Honor. The debtors' witness is Nelson Roque and the Wells Fargo's appraisal witness is Ernst Mompremier. Both debtors' attorney and I have agreed that the -- that both appraisals can be admitted into evidence. Debtors' appraisal is their Exhibit 1. My appraisal is our Exhibit A.

Basically, this is -- we want Your Honor to hear the testimony and the cross-examination of both appraisals to reach a determination as to the fair market value of the property on the date of the bankruptcy filing of August 29, 2011. It's my understanding that both appraisals are retrospective appraisals to that date.

THE COURT: Very well.

MS. GARCIA: Your Honor, I have one more exhibit to enter into plaintiff's exhibits, which is Exhibit Number 2, which is my appraiser's insurance and a copy of his license, which I believe there is no problem with.

MR. KOURI: When I said that the exhibits go in, Your Honor, I consider that part of the appraisal.

THE COURT: Okay. Very well.

MR. KOURI: We've done the same thing. It's actually the last two documents of our appraisal as well. So, I'm just saying that we've agreed that both exhibits go into evidence.

THE COURT: Okay.

(Thereupon, Debtors' Exhibit Number 1 and Wells Fargo's Exhibit A were received in evidence.)

MS. GARCIA: Perfect. Then, Your Honor, if I may, I would like to call my first witness.

THE COURT: Please do.

MS. GARCIA: Nelson Roque.

THEREUPON:

NELSON ROQUE

after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. GARCIA:

Q. Good afternoon, Mr. Roque. Can you, please, state your full name and your professional address for the record?

A. Nelson Roque, 741 1st Street, Northwest, Naples, Florida 34120.

Q. And how are you employed?

A. I'm employed as a state-certified residential appraiser.

Q. Do you work for yourself or for a company?

A. I work for myself, NDR Appraisal Group.

Q. And how long has your corporation been in operation?

A. Six years.

Q. Do you currently hold a license as a certified

residential appraiser?
A. Yes, I do.
Q. Do you hold a real estate appraiser's errors and omissions insurance policy?
A. Yes, I do.
Q. Do you hold any other professional licenses?
A. I'm also a licensed realtor.
Q. Have any of your professional licenses been revoked?
A. No.
Q. Did you perform or obtain any training prior to obtaining your license --
A. Yes.
Q. -- as a certified appraiser?
A. Yes.
Q. What type of training did you take?
A. Well, I took Ab-1 course as a registered trainee appraiser, Ab-2 as a state-certified appraiser, and then in between there's continuing education that you must do every two years.
Q. How many residential appraisals have you performed during your career to date, approximately?
A. Over 7,000.
Q. How long have you been doing this as your sole -- is this your sole -- let me restate. Is this your sole profession?

A. Yes, it is.
Q. How long have you been doing this?
A. Since 2003 as a trainee and since 2006 as a state-certified appraiser.
Q. And for what type of clients to you prepare appraisals for?
A. I prepare appraisals for Fannie Mae, Freddie Mac, REO companies. I also provide them for homeowners, for divorce proceedings, for estate sales and for bankruptcy as well.
Q. What type of appraisals do you perform when you go out to a site? Do you do full appraisals, desk appraisals?
A. Well, when you go out to the property, it would be a full appraisal or it could be an exterior, which would be a drive-by appraisal.
Q. Are you an FHA-approved appraiser?
A. Yes, I am.
Q. The appraisal you are testifying about today is regarding a property located in the city of Hialeah. How many appraisals have you done in that area?
A. Several hundred.
Q. In preparation for this appraisal, what did your examination reveal regarding what types of sales are driving the market in the Hialeah area where this property is located?
A. Well, 85 percent of the sales that occurred within a one-year period of the retrospective date on the appraisal

were either REO sales or short sales. 85 of them were. So, the market was being driven by REO and short sale.

Q. In your examination of these sales, how many sales took place within a year's period in this area?

A. Within a two-and-a-half mile radius of the subject property, 29 sales; both within a mile and within the same ZIP code, 11.

Q. And out of those 11 sales, how many were REOs or short sales?

A. Can I go back a second?

Q. Yes.

A. I made a mistake. It's 13 not 11.

Q. So, to clarify the record, there were a total of 13 sales?

A. Within one mile.

Q. Within one mile. Okay.

A. Of the subject property.

Q. Within one mile, 13 sales. Okay.

A. And 11 of them were either short sales or REO sales.

Q. What is an REO sale?

A. An REO sale is when the bank has taken certificate of title back on the property and they put it up on the market for sale.

Q. When you examined the subject property what was the condition of the property?

A. The property was in average condition. The lady had had some water damage or some roof damage to the property, but it was in average condition.

Q. Had you had an opportunity to appraise the property before?

A. Yes.

Q. When you first appraised the property was the condition the same as it was on your return visit?

A. No.

MR. KOURI: Objection, Your Honor. The appraisal that's been proffered and admitted into evidence is an appraisal ---

MS. GARCIA: I'll strike it. I'll strike that, Your Honor.

THE COURT: All right.

BY MS. GARCIA:

Q. Were you able to come up to a determination as to the value of the property when you visited the residence on August 29 with consideration of the damage that the property had on that date?

A. Yes.

Q. What is the value?

A. 95,000.

Q. Can you, please, describe for the Court how you came to that value, how you came to that figure?

A. Well, I came up with three comparable sales that were verifiable through the MLS and verifiable through the realtors involved with the transaction and I found those to be the best comparable sales at the time and I utilized those.

Q. What is the MLS service that you're referring to?

A. It's Multiple Listing Service from the Realtor Board.

Q. And why do you use this database?

A. Well, it's a verifiable source of the transaction and it's really the standard for any transaction that's going to be financed or any transaction having to do with lending purposes.

Q. What do you mean by verifiable? Can you, please, elaborate on that?

A. Well, verifiable means that a realtor, a listing realtor, was the realtor involved with listing the property for sale.

A selling realtor was involved also in the transaction and all of the address, the size of the property, the year, how the property sold, whether it was conventional or FHA or a cash deal, everything is recorded into the realtor page of the MLS listing.

Q. Can you, please, turn to Plaintiff's Exhibit 1 in the book that I provided you, Page 3, the area where you indicated the comparables you used?

A. Yes.

Q. Okay. Property Number 1 that you compared the subject property to is located at 50 West 24 Street. How much did that property sell for?
A. 105,000.
Q. And was this an arm's length transaction?
A. Yes, it was.
Q. Was it a regular sale or a foreclosure REO sale as you have referred to?
A. It was an REO sale.
Q. What were the similarities with our subject property?
A. Same bathroom count. 60 square feet of difference in size. Similar lot size.
Q. And this property was listed on the MLS?
A. Yes, it was.
Q. And you did verify the sale?
A. Yes. I verified it with the realtor.
Q. On what date was this property sold?
A. This property was sold July 4, 2011.
Q. We're moving now to Property Number 2 that you've used in your comparables, which is the property located at 61 West 14 Street?
A. Yes.
Q. How much did this property sell for?
A. $92,000.
Q. And was this a regular sale or, once again, a

foreclosure REO sale?
A. A foreclosure sale.
Q. What were the similarities with our subject property?
A. Same bathroom count. It was a larger property than the subject property and in the same area, within .71 miles of the subject property.
Q. And did you verify this sale?
A. Yes. I verified it with the realtor.
Q. And the property was on the MLS, correct?
A. Correct.
Q. When was the property sold?
A. August 4, 2011.
Q. So, on the same date the debtor filed for bankruptcy.
Okay. Property Number 3 that you used in your comparables --
A. Yes.
Q. -- property located at 66 West 27 Street?
A. Correct.
Q. How much did this property sell for?
A. Sold for $90,000.
Q. Now, this is the same comp that the bank has used in their comparables, correct?
A. Correct.
Q. It's the bank's Comparable Number 1?
A. Correct.

Q. Was this a foreclosure, the 90,000 that you're referring to, a foreclosure or an REO sale?
A. Yes, it was an REO sale.
Q. And what were the similarities with our subject property?
A. Same bathroom count, a little bit smaller than the subject property, within one mile of the subject property.
Q. And when was this property sold?
A. March 17, 2011.
Q. Did you verify the sale?
A. Yes, with the realtor involved in the transaction.
Q. And this transaction was on the MLS?
A. Yes, it was.
Q. Can you then explain the difference in sales price indicated by -- in your appraisal and that of Mr. Mompremier's appraisal?
A. I didn't understand the question.
Q. Okay. Can you, please, turn to the Bank's Exhibit 1, Page 3, the area where Mr. Mompremier sets forth his comparables?
A. I can't find it.
MS. GARCIA: Your Honor, may I approach?
THE COURT: You may.
MS. GARCIA: Thank you.
MR. KOURI: Sandy ---

MS. GARCIA: Yes.

MR. KOURI: Or Ms. Navarro. I'm sorry. This may be the issue. I don't know if he has Mr. Mompremier's appraisal.

MS. GARCIA: Yes.

MR. KOURI: If I may, Your Honor. If I can hand to you Mr. Mompremier's original appraisal -- I'm sorry. This is your copy, Your Honor. This is going to be the original one that will be admitted into evidence -- or has been admitted into evidence.

THE COURT: Very well.

MS. GARCIA: And, Your Honor, if I may approach? I have my book for you as well.

THE COURT: Very well.

MS. GARCIA: Thank you, sir.

THE COURT: Mr. Kouri has a thicker book than you.

BY MS. GARCIA:

Q. Are you on the page, Mr. Roque?

A. Yes.

Q. I would like to go back and ask another question before I proceed.

Have you had an opportunity to review the appraisal performed by Mr. Mompremier as to the value of the property on August 29, 2011?

A. Yes.

Q. Okay. He appraised the property at being worth 225

as of August 2011, correct?
A. Correct.
Q. So, it appears that you and the bank's appraiser have used the same property on both reports. You have it as Comp 3. Mr. Mompremier has it as Comp 1. Yet -- and both of you are indicating a same MLS number but different sales prices.
Can you, please, explain the difference?
A. Yes. In my appraisal I used the MLS number that was assigned to that transaction with the days on the market that the property sold in. In Mr. Mompremier's appraisal there is no days on market; however, he is using the MLS number from the prior transaction of 90,000.
Q. So, which is the accurate, in your professional opinion, sales price of that property on August of 2011?
A. I don't understand.
Q. What was the property sold -- that Comp that you are using, what was the sales of ---
A. 90,000 is the sale associated with that MLS number.
Q. On August of 2011?
A. No. On March of 2011.
Q. Of 2011. Let's go to Comp 2 --
A. Okay.
Q. -- of Mr. Mompremier's appraisal.
A. Uh-huh.
Q. It's the property located at 1280 West 31st Street.

A. Okay.

Q. How much did that property sell for?

A. $250,000.

Q. And it was sold on?

A. May 18, 2011.

Q. In your examination and preparation for this hearing, were you able to verify this sale?

A. Well, I spoke to the realtor involved in the transaction.

Q. When verifying this transaction, what information did you obtain from the realtor?

A. Very little information. The realtor was vague as far as the total transaction.

Q. Did you find a corresponding mortgage on the Miami-Dade Clerk of Court for the transaction that was recorded?

A. No. There was no mortgage issued on that transaction; however, the MLS listing page said that it did have a conventional mortgage and I asked her about that.

Q. Were you able to find a conventional mortgage in the Clerk of Court records?

A. No. There was no mortgage issued.

Q. In your professional opinion, with about over 7,000 appraisals under your belt, would you classify that transaction as a legitimate aboveboard transaction?

A. No.

MR. KOURI: Objection as to the use of the term legitimate and aboveboard. There's no evidence one way or the other.

THE COURT: Well, no evidence of what?

MR. KOURI: The terminology whether a transaction was legitimate or not legitimate. We either have a sale or don't have a sale. We don't know all the particulars in that particular transaction. How can anyone say it's not a legitimate transaction?

THE COURT: All right. Rephrase the question leaving out those two words.

BY MS. GARCIA:

Q. In your professional opinion was this a valid -- would you classify the transaction as a valid real estate transaction?

A. No.

Q. Can you explain why?

A. Well, the property sold previously for a 180,000 -- hold on. Let me get the exact number before I quote a number. I'm missing that page, but I have it over there.

MS. GARCIA: Your Honor, may I approach the witness with the documents?

THE COURT: You may.

MS. GARCIA: These are his notes. Nothing is

being ---

MR. KOURI: Your Honor, I'm going to object to any documents being presented right now that's not --

MS. GARCIA: I'm not even sure what these are.

MR. KOURI: -- that has not been moved into evidence as an exhibit. It never made the debtors' exhibit register.

THE COURT: Is it in the register?

MS. GARCIA: No, Your Honor. It's not.

BY MS. GARCIA:

Q. Mr. Roque, we're going to go from your memory --

A. Okay.

Q. -- as to the information. The following -- okay.

So, no mortgage was given. Can you give us a background of what you recall was the sales price originally paid and what it sold for about a month -- or five months later?

A. I believe it was 170,000 and it sold for 250 in a declining market.

Q. Why would someone do this if it's an all-cash deal or if there's no -- why would someone pay $250,000 five months later on an unimproved property?

MR. KOURI: Objection to the speculative question as to what someone who's not in the court would do.

THE COURT: Sustained.

BY MS. GARCIA:

Q. In your professional opinion, when you see cases like these, has money been exchanged between the buyer and the seller?

MR. KOURI: Objection. Again, calls for speculation.

THE COURT: Sustained.

BY MS. GARCIA:

Q. We're going to move to property Number 3.

A. Okay.

Q. The property located at 167 West 25th Street. Were you able to verify this sale?

A. There was no way to verify that sale. It was not -- it was not listed. It was listed in the MLS with a cancelled expired listing to it, with no days on the market and it sold for 235.

Q. Did you find any corresponding mortgage on the Miami-Dade Clerk of Court for the mortgage associated with this property?

A. No.

Q. It sold for how much pursuant to the comp information provided in Mr. Mompremier's appraisal?

A. It sold for 235.

Q. In your review of the documents, how much do you recall the property sold for one month prior, in October of 2010?

A. $90,000.

Q. What does the sales price difference from one month to the other indicate to you in your professional opinion?
MR. KOURI: Again, objection. Calls for speculation.
MS. GARCIA: I'm asking him as a professional how such increase in a declining market ---
THE COURT: You can't ask him how. You can ask him if he has any idea how or if he knows how.
BY MS. GARCIA:
Q. Mr. Roque, do you have any idea how the property would have gone up in value, about 125,000, within a month's period, in a declining market, as noted by both you and Mr. Mompremier's appraisal?
A. That type of gain in value on a property hasn't existed since 2006, at the peak of the market, which would have been November of 2006.
Q. And what would such a hike in price indicate to you?
MR. KOURI: Again, objection. Calls for speculation.
THE COURT: Well, it may indicate something to him. I'll overrule that objection.
BY MS. GARCIA:
Q. You may proceed and answer.
A. What would it indicate to me?
Q. Yes.
A. Money laundering. It would indicate fraud.
Q. Have you done any work for commercial banks such as

Wells Fargo, Bank of America, Chase?
A. Yes.
Q. Would these lending institutions give out a mortgage using an appraisal that uses comparables that cannot be verified?
A. No.
MR. KOURI: Objection. Again, it calls for speculation and -- calls for speculation.
MS. GARCIA: I'll rephrase the question, Your Honor.
BY MS. GARCIA:
Q. When you've been employed by the banks such as Wells Fargo, Bank of America or Chase, one of the main lending institutions, what has been a criteria in terms of the comparables that you can use in providing them with an appraisal for purposes of lending money to a consumer?
A. A verifiable comparable sale.
Q. If a comparable property cannot be verified, would that client that you have allow you to present that appraisal?
A. They would allow me to present the appraisal, but they would turn back the appraisal for corrections.
Q. Would a lending institution require you to verify the transaction and the days on market for a property?
A. Yes.
Q. How do you account for the difference in the appraised value of Mr. Mompremier's report versus yours?

Because the values are completely different. We have 95,000 from your side and 225,000 from Mr. Mompremier's side. How can you account for such a disparate large difference? Usually -- answer the question. Go ahead. I'll stop.

A. Basically, it has to do with the comparable sales utilized. One set of comparable sales will give you a positive reading for $95,000 and another set of comparable sales would give you a different reading of $225,000.

Where the difference comes in is in the actual sales being utilized and what happened with these sales and are they verifiable through a realtor.

Q. So, you believe yours are the appropriate comparables to be used in determining the value of this property?

A. Yes, I do.

THE COURT: What kind of a question is that? Did you think he would say no, I'm all wrong?

MS. GARCIA: I just wanted to hear him say it.

BY MS. GARCIA:

Q. Both your appraisals and Mr. Mompremier's appraisals clearly state that the property in the area are declining in value, correct?

A. Correct.

MR. KOURI: Objection, Your Honor. There's only one appraisal that has been admitted into evidence on behalf of Mr. Roque and the debtor. The debtor's question asked for two

appraisals. There's only one appraisal into evidence. So, I object to the form of the question.

MS. GARCIA: I was referring to -- I'm sorry. Let me restate.

BY MS. GARCIA:

Q. Mr. Mompremier's appraisal, which we admitted in the beginning, and your appraisal, the one you conducted that's admitted in evidence, both state that the property is in a declining market, in a declining in value area, correct?

A. Correct.

Q. What implication does the fact that the subject property is located in a declining market with property inventory imbalance on the normal marketing time for a period of three to six months have on the value of the subject property on August of 2011?

MR. KOURI: Objection. The question brings facts that are not into evidence at this point.

THE COURT: I don't understand the objection.

MR. KOURI: She's -- the question had a series of conditions to it, one of which was the declining market, which he's already testified to, but it added a series of different conditions to it that we're hearing for the first time. So, it's not anything that's been admitted into evidence or testified to at this point.

THE COURT: What are those conditions?

MS. GARCIA: I'll break the questions down.
THE COURT: All right. Then I sustain the objection. Go ahead.
BY MS. GARCIA:
Q. Mr. Roque, is the subject property located in a declining market?
A. Yes.
Q. What is the property inventory in the city of Hialeah during August of 2011? How was the property inventory in Hialeah in August of 2011?
A. Stable, as it states in my appraisal and in Mr. Mompremier's appraisal.
Q. And so, the fact that the properties are not increasing and the market has stabilized, what does that mean to you in your professional opinion?
A. Well, I think that the question was -- well, I don't know if I'm an attorney or ---
Q. Do you want me to restate the question?
A. Yes.
Q. Okay.
A. Because the stable has -- the stable has to do with the inventory, not with the market. The market is declining.
Q. Okay. Given the -- let's restate. Given the declining market, the stability of the environment in the Hialeah area --

A. Okay.
Q. -- what effect does those two factors have on the comparables used and the valuation you procured -- or testified to today as to the value of the property?
A. The comparable sales that I utilized were comparable sales that were all verified, that were sold for cash and that were a complete substitute for the subject property. They were all substitute for the subject property.
Q. Given those factors existing at that time, in your professional opinion, those factors existing at that time, would it have been possible for properties to increase in value 125,000 within a month's turnaround?
A. No. Absolutely not.
Q. In your professional opinion, do you believe the value of this home would have increased or decreased as of the first time you saw it and the second time you saw it?
MS. GARCIA: Actually, I strike that question altogether, Your Honor.
BY MS. GARCIA:
Q. Have you seen any properties in your examinations with values over 200,000 in the area?
A. No.
Q. Moving away from the comparables. I want to ask you about the most important thing you hear about in real estate, location, location, location.

So, that said, how would you rate the location of this property?

A. It's an average location for the subject property, but it does have right in front of it -- in front of the property, 20 feet away, 109-unit apartment building and to the left of it, it has a 30-unit apartment building. It's on a dead-end street. So, all the traffic, all 109 cars and the other cars have to come in front of the subject property every day to come in and out of there. So, as far as location, it's not the best location in the world.

Q. Then given the location, the size and condition of the subject property and your review of all the information to which you've testified to today, in your professional opinion what do you believe to be the fair market value on August 2011 of our subject property?

A. $95,000.

MS. GARCIA: Thank you.

THE COURT: Cross-examination?

MR. KOURI: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. KOURI:

Q. Mr. Roque, all three of your comparable sales were REO sales, correct?

A. Yes, sir.

Q. Were there any non-REO sales that took place in the

Hialeah area or within this ZIP code in a year prior to August 29, 2011?
A. Yes.
Q. Did you use any of those as your comparables?
A. No. Would you like to know how many?
Q. I already asked you the question.
With reference to your Comparable Number 3, are you testifying that the property was never sold on November 26 -- I'm sorry -- on July 11, 2011?
A. We're talking about my appraisal?
Q. Yes. Your Comparable Number 3, the property located at 66 West 27 Street, Hialeah, Florida.
A. Uh-huh.
Q. Is it your testimony that that property never sold again on or about July 11, 2011?
A. Yes, it did.
Q. It did sell?
A. Yes, it did.
Q. At what price?
A. I don't have it in front of me, but it was over 200,000.
Q. Thank you. You did not use that $200,000 sale as one of your comparables, correct?
A. Yes. I did not use it because it's not verifiable.
Q. But you did not use it as one of your comparables,

correct?

A. It's the same property, but it's not verifiable.

Q. It is one of your comparables in terms of the location?

A. Yes.

Q. So, as far as you're concerned, you do believe that that property -- that property itself, that address, is appropriate --

A. Yes.

Q. -- for use as a comparable?

A. Yes.

Q. Based on size, condition --

A. Yes.

Q. -- location, proximity --

A. Yes.

Q. -- all the factors that are used in determining?

A. Yes.

Q. However, even though you do believe that that property is suitable or appropriate for use as a comparable and even though you have -- you agree that the property sold for $200,000 six weeks before the bankruptcy filing, you still did not use that as one of your comparables, correct?

A. Correct. Because it cannot be verified. That transaction cannot be verified by no one.

Q. But you just told me that the transaction did occur,

correct?
A. At 90,000 verifiable.
Q. You just testified a few minutes ago that there was a sale of that comparable on July 11, 2011 for $200,000, correct?
A. There's a recording of a sale.
Q. Correct. There's a recording of the sale in the public records of Miami-Dade County, 200 -- documentary stamp taxes were paid on a sale price of $200,000, correct?
A. Which is very common to pay more for the stamps than what you actually paid for the property.
Q. But you do not know that to be the case, correct?
A. It's more than likely. It's a declining market. What else could it possibly be?
Q. As far as you know, in the Dade County Public Records there is a transaction on this particular piece of property for July 11, 2011 in the amount of $200,000 for which documentary property taxes were paid for the amount of $200,000, correct?
A. That Wells Fargo would never accept as a comparable sale.
Q. That is not my question, whether Wells Fargo would accept it as a comparable sale. I'm asking you ---
A. Yes, there is a transaction that was recorded that somebody paid stamps on at 200,000. That doesn't necessarily

mean that the property sold for $200,000.

Q. With respect to your appraisal, Exhibit A -- I'm sorry -- Exhibit 1, if you could kindly look at it, your Comparable Number 2.

A. Hold on one second. Yes.

Q. You said you verified that sale, correct?

A. Correct.

Q. And who did you verify that with?

A. Hold on one second. Juana Maria Gonzalez.

Q. Okay. So, in your view that sale was verified, correct?

A. Yes.

Q. And when you spoke to Ms. Gonzalez, did she tell you that that property suffered from severe termite damage?

A. No.

Q. Did you ask her?

A. No.

Q. Did she also tell you that the property was pretty much trashed inside?

A. No.

Q. And you didn't ask?

A. No.

Q. You didn't ask anything concerning the condition of the property, correct?

A. No.

MS. GARCIA: Object, Your Honor, on the grounds of hearsay.

THE COURT: No. Overruled. He has a right to inquire as to the methods he used in --

MR. KOURI: And again -- I'm sorry, Your Honor.

BY MR. KOURI:

Q. And, again, on this Comparable Number 2 that you used, this is an REO sale, correct?

A. Yes, it is.

Q. The subject property, no severe termite damage, correct?

A. The subject property?

Q. Yes. There's no severe termite damage with the subject property, correct?

A. I don't know where that's stated on the ---

Q. No, I'm asking you. Is there any severe termite damage with the subject property?

A. Not that I'm aware of.

Q. With respect to your Comparable Number 1 -- again, I want to confirm -- that is an REO sale, correct?

A. Yes, it is.

Q. Looking at Comparable Number 1 and Comparable Number 2, I note that both these properties are smaller in square footage than the subject property, correct?

A. Correct.

Q. And you make in this appraisal no adjustments for -- to the sale price because those properties are smaller than the subject property, correct?

A. Correct.

Q. There are no adjustments there. You did not add 5,000 or $10,000 to the sale price of either of those two properties, Comparable 1 and 2, even though they are smaller than the size of the subject property, correct?

A. Well, actually, Comp Number 2 is larger. It's not smaller.

Q. I'm looking at the square footage.

A. Right. The square footage is 3,093, which would be larger than the subject property. Comp Number 1 is 50 feet difference in size and I didn't feel that an adjustment was warranted.

Q. Wait a second. I'm getting confused here because I'm looking at your appraisal.

A. Uh-huh. So am I.

Q. I believe that's -- what page is that in your appraisal for the court record?

A. It's Page Number 3 of 7.

Q. 3 of 7. Where it says site for the subject property --

A. Uh-huh.

Q. -- I show 8100 square feet.

A. Oh, you're -- that's the lot size. That's not the subject ---
Q. That's fine. I'm sorry. That's fine. When I referenced the subject property, I meant the entire property including the acreage.
A. Right.
Q. So, are you telling me that the acreage on Comparable Number 2 and Comparable Number 1 are larger than the acreage of the subject property?
A. I think you're confused. First you stated the living area. Now you're talking about acreage and there is no acreage. It's square feet.
Q. Let me rephrase it.
A. Okay.
Q. So, that there is no confusion.
A. Okay.
Q. What is the site -- what is -- I'm referring to the subject property.
A. Right.
Q. You have indicated under site 8100 square feet. What is that?
A. That's the site, the lot site.
Q. That's the lot size?
A. Right.
Q. And for subject property Number 2 -- I should not

say -- strike that. It's not subject property.
With reference to Comparable Sale Number 1 --
A. Uh-huh.
Q. -- your acreage is 6,750, correct?
A. Correct.
Q. And you make no adjustment to the value of that -- to the sale price of that Comparable Number 1 --
A. Correct.
Q. -- despite it being smaller than the subject property, correct?
A. Correct.
Q. Thank you. And that's the same ---
A. There's no -- no adjustment is warranted for the difference.
Q. And that's the same thing that you did --
A. Uh-huh.
Q. -- with Comparable Number 2?
A. Uh-huh.
Q. You made no adjustment for the smaller lot size, correct?
A. None was needed.
Q. But you made no adjustment for the small ---
A. Because none was needed.
Q. Yes or no? Did you make ---
A. No. I made no adjustment.

Q. Thank you.
When you prepared this appraisal, your Exhibit Number 1 --
A. Uh-huh.
Q. -- did you have Mr. Mompremier's appraisal, Exhibit A, in front of you?
A. When I prepared the second appraisal?
Q. Well, the only appraisal that's admitted into evidence, your second appraisal, correct?
A. Yes. Yes.
Q. And you had Mr. Mompremier's appraisal?
A. Yes.
Q. And you took from his appraisal some language, correct?
A. No.
Q. You did not?
A. No.
Q. You did not take from his appraisal -- your Page 2 of 7, if you can look at that.
A. Sure.
Q. Middle of the page.
A. Okay.
Q. Where it starts with "the rental survey." Is that entire paragraph taken from Mr. Mompremier's appraisal word for word?

A. No. That's a common response.

Q. That's a common response. Okay. Including the failure to include a coma in between condition and size?

A. It's a common response that's dropped down from the software.

Q. Now, Comparable Number 2 -- I'm clear as to your direct testimony on Comparable Number 2.

A. Uh-huh.

Q. You indicated that -- and then my notes say the following. I want to make sure that it's correct. You said that with respect to Comparable Number 2 there was a prior sale of $170,000?

A. I would need to look at my paperwork to give you the exact figure.

Q. Well, you testified without that paperwork when you --

A. There was ---

Q. -- when Ms. Navarro was examining you, correct?

MS. GARCIA: Your Honor, I'd like to object. I'd like to clarify the record. He testified he was recalling, not giving the specific amount. It was an estimate.

BY MR. KOURI:

Q. That's fine. Did you recall -- was your testimony ---

A. And now we're talking about which comp, my Comp

Number 2?
Q. Okay. Your appraisal. Your Comparable Number 2.
A. Correct.
Q. Do you recall testifying a few minutes ago that you recalled a prior sale of that property for $170,000?
A. No, not my Comparable Sale Number 2.
Q. No? Okay.
A. It was Mr. Mompremier's comparable sale.
Q. Okay. I stand corrected then.
So, Mr. Mompremier's Comparable Number 2, the property located at 1280 West 31st Street, Hialeah, Florida 33012, you recall a prior sale of 170,000, correct?
A. More or less. All of them had prior sales.
Q. And when was that prior sale?
A. One happened within 30 days of the sale that he's recording. It happened 30 days. Another one happened five months prior to it.
Q. Okay. Okay. Let me clarify. So, we're talking about Mr. Mompremier's --
A. Uh-huh.
Q. -- Comparable Number 2, one -- the address is 1280 West 31st Street, Hialeah, Florida 33012. This is the property in which Mompremier says it has a sale price of 250,000, correct?
A. Correct.

Q. Now, you recall certain prior sales existing with that property?
A. With all three properties.
Q. Well, let's just focus right now, so we don't get totally confused ---
A. Okay.
Q. Let's focus on Comparable Number 2, Mr. Mompremier's Comparable Number 2.
A. Okay.
Q. So, what were the amounts of those prior sales, if you recall? You mentioned one at 170,000, correct?
A. If I could borrow the paperwork that I have, I could tell you exactly what the exact figure would be.
Q. Certainly.
MS. GARCIA: Your Honor, if I may approach the witness?
THE COURT: You may.
BY MR. KOURI:
Q. Again, let's focus on Mr. Mompremier's Comparable Number 2, so we don't get confused.
A. Okay.
Q. Take your time.
A. Okay. I have it in front of me.
Q. Okay. What was the amount of the prior sale?
A. The property sold for 180,000.

Q. And when was that?
A. In December 2010.
Q. That is approximately eight months before the bankruptcy filing, correct?
A. Well, it's five months from the $250,000 sale.
Q. Okay. It's fine, but that's about December of 2010 and the bankruptcy was filed August 29, 2011. So, you, in looking at your notes, acknowledge that Mr. Mompremier's Comparable Number 2 sold for $180,000 on December 2010, correct?
A. Correct.
Q. But you did not use that sale as a comparable, correct?
A. Correct, because --
Q. Were there any prior sales with respect to that property?
A. -- it could not be verified.
Q. Were there any -- but your notes say that that sale occurred, correct?
A. The County recorded a transaction, but the MLS ---
Q. That's fine. So, are you saying that we should not rely on something that's recorded in our County records, that the MLS, which is not our County records, is what we should be referring to and we should ignore what people pay documentary stamp taxes on and what everybody dealing with real estate

looks to to verify that something has occurred? You want us to ignore the County records?

A. Well, the County records could be altered.

Q. Is it your testimony that we should be disregarding a $180,000 prior sale in December 2010 -- even though that sale is recognized in the County records --

A. Yes.

Q. -- we should ignore it --

A. Yes.

Q. -- because it's not listed in MLS?

A. Not only is it not listed, it cannot be verified.

Q. Okay. So, we should ignore the County records?

MS. GARCIA: Objection, Your Honor.

THE COURT: What's the objection?

MS. GARCIA: The question has been asked and Mr. Roque has answered it.

THE COURT: And this is cross-examination. It can be asked 20 more times.

BY MR. KOURI:

Q. Any other prior sales set forth with respect to Mr. Mompremier's Comparable 2 in your notes?

A. Any what?

Q. In addition to the $180,000 sale that occurred on December 2010, are there any other prior sales that your notes reflect with that Comparable Number 2?

A. A certificate of sale for $100.
Q. Okay. And that would be a foreclosure sale, correct?
A. Correct.
Q. Thank you. Check your notes with respect to Mr. Mompremier's Comparable Sale Number 1, 50 West 24 Street, Hialeah, Florida.
A. Okay.
Q. Were there any prior sales -- were there any other sales concerning -- I'm sorry. I'm sorry. I take that back entirely. I am reading your appraisal, your Comparable Sale Number 1.
A. So, mine?
Q. Yes, your Number 1. I'm sorry. You can go to that.
A. Okay.
Q. Just to clarify the record, your Comparable Sale Number 1 is for the property located at 50 West 24 Street, Hialeah, Florida?
A. Yes.
Q. Are there any sales that occurred with that property after the sale that you utilized on July 4, 2011?
A. Not that I'm aware of.
Q. Thank you.
MR. KOURI: If I may have a minute, Your Honor?
THE COURT: You may.
BY MR. KOURI:

Q. Mr. Roque, again referring to your comparable sales in your Exhibit Number 1, did each of these units have central air conditioning; or I should say, did each of these comparables have central air conditioning?

A. Comp 1 had wall units.

Q. You did not make any adjustments to the sale price for the lack of central air conditioning, correct?

A. Correct.

MR. KOURI: Thank you.

THE COURT: Very well. Are we finished with this witness?

REDIRECT EXAMINATION

BY MS. GARCIA:

Q. Mr. Roque, I'm going to ask you a couple of more questions.

A. Yes.

MS. GARCIA: If I may, Your Honor.

BY MS. GARCIA:

Q. If a transaction cannot be verified, what probative value does it hold for an appraisal in your opinion?

A. I don't understand the question.

Q. If you can't verify an appraisal, what implication ---

A. An appraisal or a sale?

Q. I'm sorry. If you can't verify a sale, what

implications does it have on your appraisal?

A. Well, the credibility of the appraisal, for one thing. The other thing is that that's kind of what got the market -- the housing market in trouble to start with. The sales that were being utilized before 2006, before the banks changed what they are willing to accept on an appraisal, you could just put public record numbers. You didn't even need MLS or days on market. You could just use any sale that occurred, any sale that was recorded in the County, that somebody paid tax stamps on it and put it on an appraisal and the bank would qualify that as a sale, as a legitimate sale and lend money on that house.

They no longer do that as of 2007, after the crises with Goldman Sachs, with William Lehman, with Lehman Brothers. They no longer accept that. Countrywide. None of them. None of them banks that went out of business, the banks that bought their loans will no longer accept that -- them types of sales.

Q. Is this why you do not use unverifiable sales in your appraisals?

A. Yes.

Q. Why was there no adjustment warranted because of the different lot sizes? Can you, please, explain that?

A. Well, this was an appraisal that was done not for the purpose of financing. It's up to the appraiser, to his discretion, whether an adjustment is warranted or not.

In Hialeah, there is no way to define that a lot size of 8100 and a lot size of 6700, that the normal buyer that would buy one house would not buy the other one because of 1300 square feet missing in the lot. There's no way to adjust that without getting into a gray area that there is no exact science to be able to give that a value. You could adjust it by a dollar. I might adjust it by $5 a square foot. Another appraiser might not adjust it at all. It's up to the appraiser's discretion.

Q. When you verified your three comparable properties --

A. Yes.

Q. -- did you follow the guidelines that are the norm in your industry?

A. Yes.

Q. Why didn't you ask the -- Ms. Juana Gonzalez about termite damage?

A. I didn't think it was pertinent. Not every house has termite damage and I don't ask on every house if they have termite damage.

Q. Is there an agency or an entity that provides guidelines for appraisers as to ---

A. Basic appraisal principles, the Appraisal Institute, different books.

Q. Is there a state-run or federally-run entity that overlooks appraisers?

A. Yes.
Q. Do you know the name of it?
A. Department of Business and Professional Regulation and the Appraisal Board.
Q. And you believe you were in compliance with all of the guidelines set forth by those entities?
A. Yes.
Q. Why don't you use ---
MS. GARCIA: Strike that, Your Honor. If I can have a moment, please?
BY MS. GARCIA:
Q. Mr. Kouri asked you regarding Comparable 3 of your appraisal, Comparable 1 of Mr. Mompremier's appraisal.
A. Uh-huh. Yes.
Q. And he asked you if you believe that that sale had necessarily taken place.
In your professional opinion, do you believe that transaction took place at the higher sales price indicated in Mr. Mompremier's appraisal?
A. I believe a transaction took place. I just do not believe that in a declining market the property gained or that anything was done to the property to warrant that type of appreciation, a hundred percent appreciation, when that hasn't happened any longer.
MS. GARCIA: I have no further questions, Your Honor.

Thank you, Mr. Roque.

THE COURT: Re-cross?

MR. KOURI: No, Your Honor.

THE COURT: Very well. You can step down, sir.

(Thereupon, the witness was excused.)

(Thereupon, a brief recess was taken, after which the following proceedings were had:)

THE COURT: Okay. Coming back now to the movant. Are you ready to put on your witness, Mr. Kouri?

MR. KOURI: Yes. Your Honor, I call to the stand Ernst Mompremier.

THEREUPON:

ERNST MOMPREMIER

after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KOURI:

Q. Please state and spell your full name for the record, please.

A. My full name is Ernst Mompremier. E-R-N-S-T M-O-M-R-E-M-I-E-R.

Q. Mr. Mompremier, how are you employed?

A. I work for Deluxe Appraisal Services.

Q. What is Deluxe Appraisal Services?

A. It's a company that provides appraisal for single --

for residential properties.

Q. Do you own Deluxe Appraisal?

A. Yes, I do.

Q. What work do you do for Deluxe Appraisals?

A. I do property appraisal, meaning that I go to the property, inspect them, evaluate the property, and I do this kind of work -- I've been doing this for a while and I do them for banks, various entities, for individuals, for pre-listing, for bankruptcies and for divorce proceedings, for estate.

Q. How long have you been appraising property?

A. I've been appraising property since 2002. I took my classes between -- first I started as a trainee appraiser. I worked for three different companies under the guidance of certified appraisers, under the guidance of some commercial appraisers also, and after that I applied -- I took the classes and I applied for the state certification, which I obtained in 2005, and I've been working as a certified appraiser since then.

Q. How many appraisals have you done since you started as a trainee?

A. Combined from the time I started as a trainee until the present time, I'd say in excess of maybe 8,000. Maybe.

Q. Can you clarify for me again what licenses you have?

A. I have a state-certified license from the State of Florida, from the Department of Professional Services, and

normally known as DBPR, and I'm also certified by FHA to do appraisals on their behalf.

Q. Did you at some time appraise for -- or shall I say -- strike that.

Did you at some time inspect for appraisal the property located at 639 West 14 Street, Hialeah, Florida?

A. Yes, I did.

Q. When was that?

A. That was the first week -- that was the last weekend of December, the Friday, but since the property -- when I first received the request it was listed as a single family. When I entered the property I realized it is not a single family. It is a multi-unit. I notified the lender, the EMC, that sent me the request and I told him it cannot be done because the public records clearly stated that the property is a three-unit, not a single unit. So, therefore, it has to be done as a three-unit property in comp properties, and they changed the order and I subsequently went back to the property the following week to redo the appraisal. Besides, I was not able to access all the units in the property the first time.

Q. Okay. So, you had to go to the property on multiple occasions?

A. Twice.

Q. And the first time you went you were able to inspect part of -- which unit did you inspect the first time?

A. I inspected the main house, which is a 3-bedroom/2-bath.

Q. Which you, in your appraisal, called Unit Number 1?

A. Unit Number 1.

Q. Are there other units to the property?

A. Yes. There are two other units that were added to the property.

Q. And did you have a chance to inspect those two other units?

A. The following time.

Q. While we're on the subject, on this area of your testimony, I do not think we adequately described the property earlier in the direct examination of the debtors' case. Describe the property for me. Tell me a little bit about the property.

A. Originally, the property was a single-family, but they added two auxiliary units to the property on the east side. Both of those units are 1-bedroom/1-bath with a small kitchen and their own bathroom. However, on the west side of the property, they also have a small enclosure. It's like a -- it's sort of a carport that was enclosed and it's not a legal unit, but they are using it as a living area. However, for the purpose of the appraisal we did not use that area as part of the GLA, otherwise known as the living area of the property.

Q. Is the construction of this property concrete CBS?
A. It is concrete CBS except for that west side, which is basically fiberglass/aluminum material.
Q. Does the property have central air conditioning?
A. The main house has central air. The two units each have wall units in there.
Q. And I note in your appraisal you mentioned something about a driveway and a number 7. What does that mean?
A. This is the number of cars that you can park in the driveway.
Q. You can park seven cars in the driveway?
A. Yes, because it's -- because what they did, they put concrete in the front yard. They don't have grass in the front yard. So, anybody can park basically anywhere. At one time -- the second time when I went there, there was about four cars parked next to each other and there was spaces left behind for me to park and for some other people to park.
Q. I'm looking at your Page 4 of 30, towards the bottom, if I count correctly, I'm showing that this property consists of three units and a total of 12 rooms. Am I correct?
A. 4 of 30. Is that the page that has the sketch?
Q. It's your Page 1 of 7. On the top it says 4 of 30.
A. 4 of 30. Okay.
Q. Under the general description.
A. Yes. What section?

Q. Towards the bottom. Are we talking about a home that -- a house that has 12 rooms?

A. Yes, approximately. Because some areas people call room that are not really room per se, but you can say that.

Q. But pursuant to your appraisal you're showing it down as having 12 rooms, correct?

A. Yes.

THE COURT: What page are you on, Counsel?

MR. KOURI: On Exhibit A, Your Honor, the top right-hand side would say ---

THE COURT: I see page ---

MR. KOURI: Number 4 of 30 on the top right-hand side.

THE COURT: 4 of 30. Okay. I'm there right now.

MR. KOURI: Thank you.

BY MR. KOURI:

Q. Mr. Mompremier, tell us a little bit about the two days that you visited the property and inspected it. What did you do on those particular inspections?

A. The first day I measured the property. I took pictures of the different rooms. I noted the condition of the property. I asked -- I tried to ask some questions about some of the improvement that they made to the property because the kitchen was fairly new. One of the bathrooms was updated. One of the other bathrooms was not. The second bathroom in

the main house was not. The bathroom and the kitchen, all the area in the Unit Number 2 and 3, they were fine. I noted some stain in the ceiling around the dining area in the property and I asked them was the roof leaking. They said it was leaking at one time. They fixed it. It's fine. And I made note of that in the report.

Q. I refer you to Page 5 of your appraisal. I should say Page 5 of 30, top right-hand corner.

A. Yes.

Q. What did you mean by the conclusion that you reached there in that first line where it says, "are there any physical deficiencies or adverse conditions that affect the livability, soundness or structural integrity of the property?" You said no. What does that mean?

A. That -- FHA guidelines refers to the three Ss. That means that you have to be certain that the structure is sound, there's no safety issue in the property, and that it's in a livable condition.

So, the question -- I addressed those issues and the answer was clearly no, because in the main house you have all the people were living there. There was no issues affecting their health, the structure of the property. The only notable issue was the stain on the ceiling and they had assured me that the roof had been repaired.

Q. And when you say "they," you're referring to the

debtor?

A. Yes.

Q. Does this property produce income?

A. Yes, it does.

Q. How do you know?

A. Because you have two other units. I spoke to someone from the attorney's -- from the debtors' attorney's office. They told me his family members, but family members sometimes contribute also and they provided me information that they were paying about $450 per month for those units.

Q. For each unit?

A. For each unit. And that is not standard market because a 1-bedroom in the area based on the research that I have done ---

MS. GARCIA: Your Honor, I object to Mr. Mompremier's testimony as to what he's saying he received. The debtor has filed the petition and filed the affidavits of support which are -- what we provide are the rental received for this property. I'm not even sure the numbers coming from Mr. Mompremier at this time, if they're accurate or not.

THE WITNESS: May I answer that?

MR. KOURI: No. No. The Judge has ---

THE COURT: Any response?

MR. KOURI: Your Honor, the figure of $450 per unit, per Units 2 and 3, is a figure that was used in the debtors'

own appraisal. That figure was there. The information was obtained from the debtor and nobody has objected to our appraisal. Our appraisal has come into evidence and those figures are figures that were provided by the debtor and used in their own appraisal.

MS. GARCIA: Your Honor, if I may ---

THE COURT: Just wait till he finishes.

MR. KOURI: Nobody is disputing -- nobody has ever disputed that each of the two units, 2 and 3, are generating $450 per unit in rental income.

MS. GARCIA: My apologies, Your Honor. I heard that he was testifying like -- that he had been told.

THE COURT: Well, I agree with you. I will sustain your objection as to what he spoke to someone about, which is hearsay, but if this matter is in the file, you can present it as taking judicial notice of the court file about the -- does it say 450 twice or is it only ---

MS. GARCIA: I would ask that Your Honor allow me to go check, but she does have more than one. So, it would probably say it twice.

THE COURT: Okay. In other words, so, we know that it's happening, but we don't get it from the source of the hearsay comment, but rather from the record that's on file. Okay?

MR. KOURI: That's fine, Your Honor. Understood.

MS. GARCIA: Thank you.

THE COURT: Now let's proceed.

MR. KOURI: Thank you.

BY MR. KOURI:

Q. Mr. Mompremier, I'm going to refer you to your Page 6 of 30 in your appraisal, which we have admitted into evidence as Wells Fargo's Number 1. Please tell me what you did there with respect to comparable sales. What are those comparable sales?

A. Comparable sales are market sales. Basically, we use multiple sources of database to research and find properties that are comparable, the key word is comparable, to the subject. For instance, if we are appraising a single-family property, we will try to find other single-family properties that were sold within a recent -- relatively short period of time, usually three to six months, to allow the changes in the market.

Now, those properties, according to Fannie Mae and FHA guidelines, usually have to be between 25 percent of the size of the property and also they have to be researched, meaning that you have to verify them.

One good verification of source is realtors because they were privy to the transaction. However, realtors are not the only source of verification. You can approach the party of the transaction.

Fannie Mae recommends that you can verify them from one of the parties that was involved in the transaction, and also public records is one good source of verification because that's the ultimate. A realtor on the MLS may provide some information that are wrong, more than one time. Even the sales price, sometimes the realtors will put something on the MLS and when you look at the public records the amount that was recorded is different from what the realtor provided.

Q. Let me take you through Comparable Sale Number 1; or you take us through Comparable Sale Number 1.

After you analyzed Comparable Sale Number 1 what did you find out?

A. Comparable Sale Number 1 was a REO property that was sold.

Q. I'm sorry. I didn't understand you. It was a what?

A. It was an REO, foreclosure sale. That's the acronym that we use.

Q. Comparable Number 1 --

A. Yes.

Q. -- was a foreclosure sale?

A. Was a foreclosure sale. No, it was a foreclosure sale a few months before. On February 21st, 2011 it was sold for $90,000.

Now, foreclosure properties usually are in bad condition. They've either been vandalized. They might be

missing -- the kitchen might be completely missing, the bathroom, the roof. It needs to be renovated. Investment properties especially, the people that buy them, buy them at a low market -- at a low price, repair the property to bring them in living condition because at the time of the sales, as a foreclosure property, most of the time they are not in living condition. Nobody can move in there. So, they have to be repaired in order to be in livable condition and sometimes they are resold a few months later after being repaired.

Q. Okay. Let's focus now on Comparable Sale Number 1. You said at first it was an REO property. It had sold when?

A. $90,000, on February 21st, 2011.

Q. Okay. But there was a subsequent transaction, correct?

A. Yes.

Q. Is that subsequent transaction reflected in your Page 6 of 30 in your appraisal?

A. Yes. It was sold for $215,000 on July. That was roughly about five months.

Q. July of what year?

A. July of 2011.

Q. Is a more precise date July 11 --

A. July 11th.

Q. -- 2011?

A. Yes. Yes. And that was recorded in the public

records.

Q. Now, this is the same property that was also a comparable used by the debtors' appraiser, correct?

A. Yes. Correct.

Q. This property is close to the subject property, correct?

A. Yes. Within one mile. Approximately one mile from the subject.

Q. Going a few lines down on your Page 6 of 30, where the title is Sale or Financing Concessions, you indicate FHA. What does that mean?

A. FHA is ---

Q. With respect to this particular property, what does it mean?

A. That means that's a property that was financed. It was an insurable mortgage by FHA.

Q. So, the $215,000 ---

A. Was financed. They had a mortgage.

Q. And how do you know that?

A. Because it's an FHA transaction.

Q. No, but how do you know it's an FHA transaction?

A. I have -- one of the database that I use provided me that information. It was financed by Universal Mortgage & Finance, Inc. and it was recorded -- no, I don't have the recording date. It was sold by -- I have the seller and I

have right here the loan type was an FHA. The amount of the mortgage was $209,549.

Q. Thank you. Going a little bit further down in your description of that Comparable Sale Number 1, you indicate a site size, correct?

A. Yes.

Q. And the site size of Comparable Number 1 is smaller than that of the subject property, correct?

A. Yes.

Q. And because of that smaller size what did you do in terms of determining an overall value that should be allocated to Comparable Sale Number 1?

A. I did a positive adjustment for that property for the size of the site, of the land, because the property is the land with the building in it. So, the land has value as well as the building.

In order to arrive at an adjustment, what we do in appraisal, we use max space, not completely suggestive of value that we assign. We do max space, meaning that we took some sales that occurred during that period of time, we try to figure out the difference, what are the variances that are recognized by the market, because, for instance, someone might have carpet in their house, they put an expensive carpet, but I don't care about the carpet when I buy the property, I remove it and put tile. So, therefore, the value of the

carpet may not be recognized in the market, but I might recognize -- I might add value to the property because it has a garage, because it's something that I can use.

So, therefore, as appraisers, what we do, we try to identify those characteristics that the market recognizes as valuable and we try to figure out the value -- a number value to them and then we transfer that to the comparable in order to arrive at a value.

Q. What other adjustments did you make for that particular sale?

A. We did an adjustment for the size of the property, the whole building area, and also, we did an -- there was central air in all the units as opposed to the subject.

Q. Okay. So, that generated --

A. Yes.

Q. -- a reduction?

A. Yes.

Q. Because the subject -- the comparable property had centralized air conditioning throughout?

A. Yes.

Q. You mentioned very quickly that you made an adjustment for the gross building area. What did you mean by that?

A. We assign a value per square foot and then we multiply it by the difference.

Q. Because the subject property's gross building area is smaller?
A. No, it's larger than the comp. If you look at Comp Number 1, the gross building ---
Q. No. I'm sorry. I'm sorry. Listen to my question.
You made that adjustment because the gross building area of the comparable property is smaller than the gross building area of the subject property, correct?
A. Correct.
Q. Thank you. What other adjustments did you make with respect to Comparable Sale 1 to derive an overall value?
A. The subject also had a carport in the back that was recently added and, in addition, they had the enclosed patio on the west side that I mentioned earlier. So, those -- even though this is -- especially the one on the west side, is not a living area, but it does add value to the property.
Q. So, after you made those adjustments you came up to an adjusted sale price and what was the adjusted sale price?
A. For the subject?
Q. Yes.
A. It was $225,000.
Q. For the subject property?
A. Yes.
Q. Comparable sale price?
A. No, you said the adjusted sale price for the ---

Q. For Comparable Sale Number 1. What's the adjusted sale price?
A. Oh, Number 1. $232,000. $232,600.
Q. And so, what we have here is a sale price of 215,000 and after your adjustments, a sale price of 232,000?
A. Right. Yes.
Q. But well above the $200,000 range, correct?
A. Yes.
Q. Comparable Sale Number 2, what was the sale price of Comparable Sale Number 2?
A. It was sold for $250,000.
Q. Go down to the date and time of that sale. When did that sale take place?
A. That sale took place on May 18, 2011.
Q. How do you know that?
A. Public records, realtor. I checked with the realtor and the parties involved and, also, I do field research where I actually went to the property.
Q. You mentioned something about conventional sale or financing concessions. What does that mean; or conventional sale or financing. What does that mean for that property?
A. The conventional sales are sales -- mortgages that are sold in the secondary market. They are -- for those you have to go by Fannie Mae guidelines, Fannie Mae or Freddie Mac. These have the guidelines. That's the one you use as

opposed to FHA.

Q. So, this is confirmation -- or this is another way of you saying that this is not a real estate owned property, correct?

A. No.

Q. This is not a short sale, correct?

A. No. That was an arm's length transaction.

Q. And, again, you made certain adjustments to this property, correct?

A. Yes.

Q. And after making those adjustments you came out with what adjusted sale price?

A. 220,000.

Q. So, actually, in this case, your adjusted sale price is lower than the sale price, correct?

A. Yes. Yes. If I may?

Q. Yes.

A. That's because the condition of that property was superior to the subject. For instance, the building area is 2,781 square feet. So, therefore, I did a negative adjustment of $17,000 to try to bring it in line with the subject. Also, I did a time adjustment.

Q. Explain.

A. A time adjustment, in a declining market we do time adjustment to account for market values because a property

that was sold in May, if it was sold in July, it might have sold for less money. So, therefore, we took account of what's the rate of decline of the market and the Property Appraiser's Office in Dade County, I believe, reported -- if I can refer to my notes for a moment?

If you can turn to Page 12 of 30, at the bottom of the page, the last paragraph, if you go to the sentence that says the Miami-Dade Property Appraiser's Office report of -4.7 percent decline in market value for small multi-family properties in the city of Hialeah over the last year. So, therefore, when you divide that by 12, you get a rate of decline per month and you multiply that by the number of months since the property -- the transaction occurred. So, I applied that. It comes out to about $3,000 to the property itself.

Q. Understood. Understood.

Let me refer you to your Comparable Number 3. That's also on Page 6 of 30, correct?

A. Yes, sir.

Q. What was the sale price of Comparable Sale Number 3?

A. $235,000.

Q. And when did this sale occur?

A. In November 2010. November 26, 2010.

Q. How do you know that?

A. Again, I -- we have the MLS. We have the MLS. We

have the public records. I use about at least five different database, namely, Collateral DNA, the public records of Miami-Dade, the MLS, the Multiple Listing Service, IMAP, the RealQuest, and some of the database that I use to verify. So, if the information -- sometimes you might have -- information in one database is not reported someplace else, but that information was verified throughout all the database that I have.

Q. So, each of the databases that you referenced for this particular property reflected a sale of that property for November 26 of 2010?

A. Yes. Yes, they do.

Q. Again, what was the sale or financing for that particular property?

A. What do you mean the sale? The mortgage amount?

Q. It was, you said, conventional. So, we are not talking about an REO or short sale, correct?

A. No. No. No. Because the reason we don't -- we use REO if you don't have -- if that's all there is in the market as sale -- recent sale, then you have to use REOs, but if the property -- because the first key is to try to identify property that are similar to the subject because we have to compare apples to apples, oranges to oranges. If a property is in bad condition, it's lacking a kitchen, I'm not going to compare it to a property where people are living, that doesn't

need repairs.
Q. So, that's why you did not use the three --
A. Foreclosure sales.
Q. -- the comparables that Mr. Roque used in his appraisal, correct?
A. That's correct. And even the comp -- if you want to go back to Comp Number 1, Comp Number 1 not only was a foreclosure prior to that, but the most recent sale on the property itself was not as a foreclosure. So, therefore, I would not use the sales price as a foreclosure after the property has been repaired.
Q. Now, you didn't stop with only three comparables; you went on to Comparables 4 and 5, correct?
A. That's correct.
Q. And that can be found at your appraisal, Page 14 of 30, correct?
A. Yes. That's correct.
Q. Now, these properties that you put there as Comparables 4 and 5, those are not sales, right?
A. No. Those are ---
Q. What are they?
A. Those are properties that are currently listed in the market. For instance, Comparable Number 1, at the bottom of that page, where it says analysis and comment ---
Q. I'm sorry. I lost you. Where are you at?

A. The same page, at the bottom.
Q. This is Page 14?
A. Yes. 14 of 30.
Q. Yes.
A. Where it says analysis and comments.
Q. Yes.
A. Comparable Number 1 is offered as a short sale to prevent foreclosure. Listing Number 1 does not currently have central air.
THE COURT: It's not listing Number 1.
THE WITNESS: Yeah, listing -- I'm sorry.
BY MR. KOURI:
Q. But when you're referring here to Comparable 1 and 2 you mean on that particular page?
A. Yes.
Q. So, really what you're saying is Comparable Number 4 is offered as a short sale to prevent foreclosure?
A. Yes. That's correct.
Q. And then Listing Number 5 does not currently have central air conditioning, correct?
A. That's correct. And those were active listings at the moment, at the time that I did the research.
Q. And that -- okay. But for the time period of the date of the bankruptcy filing, August 29, 2011, correct?
A. No, for currently. That's what -- on the scope of

the appraisal that was requested they asked me to provide those.

Q. Okay. These two that you provided then are as of what date?

A. As of the date -- as of January -- the date that I did the research. January 3rd, 2012.

Q. Okay.

A. This is ---

Q. Now, these two properties are being sold for -- or at least being offered for well in excess of the three comparable sales that you used as Comparables 1, 2 and 3?

A. That's correct.

Q. And am I correct, but do all five of the comparables you used reflect properties that have multiple units and multiple bedrooms and income generation, correct?

A. Yes. Yes.

Q. Now, you've included in your appraisal pictures of the subject property, correct?

A. Yes, sir.

Q. And you've included in your appraisal pictures of the comparable properties, right?

A. That's correct.

Q. I refer you to your Page 7 of 30, to the top, top of the page. Could you explain what you're saying in the first two paragraphs -- actually, first three paragraphs? Right

there, on the top.

A. Yes. This is basically an explanation of the appraisal process. There's three approach to value. The first one is the market -- the sales comparable approach, where we use recent sales in the area that are similar to the subject. If it's a single-family, again, we use single-family. If it's a multi-unit, income-producing property, then we use income-producing property. Now, that one we will -- that's the one we looked at in the previous place where you have the sales comp.

Now, the second approach is a cost approach, what would it cost to build a property similar to this one if something happened to it. That's the second approach.

The third approach is the income, where we use -- we use the income that the property is producing, do a capitalization to arrive at the value. This is mostly used in commercial property, but in small residential we don't put a lot of emphasis on it, but we use it as a supportive approach for the sale comparable.

Q. So, you use three different approaches?

A. We use three different approach.

Q. And did you reach different valuation amounts for each of the three approaches?

A. I'd say about 98 percent of the time you will have different value when you use -- for each one of those

approaches.

Q. What did you reach here?

A. And then we do a reconciliation to see which is the most -- most possible for the market.

Q. We've been talking a lot about your sales comparison approach.

A. Yes.

Q. What was your conclusion concerning the value of the property using only the sales comparison approach?

A. The value was 225.

Q. And that can be found on your Page 6 of 30, towards the bottom, correct?

A. That's right.

Q. Now, you also, on Page 6 of 30, reached a conclusion using the income approach?

A. Yes.

Q. What was your conclusion?

A. $253,179.

Q. Can you tell us how you reached the conclusion with respect to the income approach?

A. Basically, we take the income that the subject is producing. In this case -- normally, we use the actual rent. If the property is rented for $5,000 or $2,000, that's what we use, but in this case you have to keep in mind the owner is living in the main -- the main -- in Unit Number 1.

Q. How did you deal with that?
A. We don't use -- what we do is we use the market research that we do for similar property, how much they rent it for. That is what we have on page -- the previous page.
Q. That's Page 5 of 30?
A. Yes. Where we do the comparable rental.
Q. And in that page you have your analysis of how you reached your conclusion, that based on your income approach the property has a value of $253,179, correct?
A. That's correct.
Q. If you look at that page, towards the bottom, the last section -- I mean, the next to last section, where it says subject rent schedule, the first one deals with the actual rent. Where it says actual rent, we have zero for the first unit, $450 for the second unit, $450 for the third unit.
Now, the last section on the right, where it says opinion of market rent, that's data that we get from the market, from the similar property that are rented in the area.
Q. Understood.
A. And what we have, if the subject -- the first unit was to be rented, it could be rented for about $1600. So, we use that.
Q. And to reach that -- to reach those figures you used comparables as well, but you call them comparable rentals?
A. Yes.

Q. Correct?
A. Yes.
Q. And those comparable rentals are on the top of Page 5?
A. Yes. If you want to look at this for a minute, you'll see that, for instance, Comparable Number 1, Unit Number 1, which has a 3-bedroom and 2-bath similar to the subject, was rented for $900. Okay? You have another one for $1,000, but we have -- those are ones -- some that we use in the report, but we have other comparable rental in my -- in my folder.
Q. To generate the numbers that you did in the middle of the page there?
A. Yes.
Q. Correct?
A. Yes.
Q. But you even used a third approach and that was a cost approach. What is the cost approach?
A. The cost approach is just to figure out how much it would take to purchase a property similar to that one if something was to happen to it.
Q. And what was your conclusion as to how much it would cost to -- in essence I guess what you mean is to rebuild the property.
A. To rebuild the property. Correct.

Q. What was the amount?
A. $167,556.
Q. Thank you. And that can be found on the bottom of Page 6 of 30 as well, correct?
A. That's correct.
Q. So, if you take all the three approaches, what was your conclusion concerning the overall value of the property?
A. Doing the appraisal by definition is what is the most likely price that a knowledgeable buyer would pay for a property in average condition.
Now, based on all the research that we did, that I did, the most likely value, the most likely sales price would be $225,000.
Q. Thank you. Did you have a chance to review the appraisal of Mr. Roque that's been admitted into evidence as Debtors' Number 1?
A. Yes. I had a chance to look at it.
Q. Did you review his comparables?
A. Yes, I did.
Q. Why would you not use those comparables?
A. If I were to go back to comp -- we have one comp that both of us used. The property was sold twice. The first time as a foreclosure property. It was in poor condition at that time. It was renovated and resold to the open market. So, therefore, I used the price that was sold on the open market,

which was the most recent sales price. It was the most recent transaction on the property.

Q. Right. Approximately six weeks before the bankruptcy filing, correct?

A. I don't know when the bankruptcy was filed. At the time I was doing the appraisal I was not privy to all this information. All I know is that here's the property, I need to appraise it. I didn't know the balance of the mortgage. I had no information regarding the figures on the transaction.

Q. Understood. I refer you to Mr. Roque's Comparable Number 2.

A. Yes, sir.

Q. Go find it, please.

A. Yes.

Q. Do you have --

A. Yes, I do.

Q. -- Mr. Roque's appraisal there?

A. Yes, I do.

Q. Take your time and go through it.

A. That would be 61 West 14 Street?

Q. That's correct. I understand that you did some investigation on that property.

A. Yes. I had a chance to ---

Q. What did you determine?

A. That was a property that was seriously damaged.

Q. How do you know that?
A. Because it states on the MLS, clearly on the MLS, that the property had termite -- extensive termite damage and there's pictures on the MLS that shows you exactly the condition of the property. It's a 2-story property. There's nothing wrong with that except that the truss, the flooring on the second floor was completely gone. It had holes. The wood was damaged. The tiles were ripped off. There was no kitchen, no bathroom. The pictures are there on the MLS.
Q. Are any of those pictures in the debtors' appraisal?
A. No.
Q. No? Are you sure? Take a quick look at it.
A. Sure, I'll look.
Q. Are any of those pictures concerning Comparable Number 2, that show the condition of the property, are they attached as pictures to the debtors' appraisal?
A. I have only one picture of the front of the property.
Q. Any pictures concerning the interior of the property that would show that damage?
A. No. No, I don't see that.
Q. So, that was not included in their appraisal, correct?
A. No.
Q. So, their Comparable Number 2 is an REO sale, correct?

A. Yes. That's correct.
Q. And based on your investigation and the pictures you saw, there was severe termite damage to that property, including other damage to the property, correct?
A. That's correct.
Q. Looking at their appraisal, can you show me in their appraisal -- I believe it's their Page 3 of 7 -- where Mr. Roque makes any adjustments for the damage to the property? Can you tell me if you see any?
A. I don't see -- there's only one adjustment in the whole page.
Q. Well, let's just focus on Comparable Sale Number 2. Do you see any adjustment for the damage to the property?
A. No.
Q. Do you see any adjustment for the fact that the property is an REO sale?
A. No.
Q. Do you see any adjustment there for the severe termite damage?
A. No.
Q. Why wouldn't you use his Comparable Number 3?
A. Comparable Number 3? I did use his Comparable Number 3.
Q. No. I'm sorry. I'm sorry. That's the one -- but not his sale. I meant -- let's go back to Comparable Number

1. Why would you not use his Comparable Number 1?
A. Comparable Number 1 was also a foreclosure property. It was in poor condition. It was -- let me point out that it's also a fourplex, a four-unit. Not that -- we can use a four-unit in -- you know, to compare -- to try to -- as a sale comparable for three units, but I had three units. So, if I have three units, why use a four-unit when I have property that are more similar?
Q. Mr. Mompremier, I'm going to refer you back to your appraisal.
A. Yes, sir.
Q. Your appraisal, which is admitted into evidence as Wells Fargo's A, Page 5 of 30.
A. Yes.
Q. Towards the bottom, with respect to your Comparable Sale Number 2, you found a prior sale to that property?
A. Yes.
Q. Even before the sale that you used. What was that prior sale?
A. December 27, 2010 for $180,000.
Q. Is that the same sale that Mr. Roque testified to as being one of the sales that he recalled?
A. Yes.
Q. You are a certified state appraiser, correct?
A. Yes, I am.

Q. You have a license?
A. Yes.
Q. Correct?
A. Yes.
Q. Who issues the license?
A. The department -- the State of Florida.
Q. How long have you had the license?
A. I've had the license since 2005.
Q. And a copy of that license is attached to your appraisal, correct?
A. Yes. At the end of the appraisal.
Q. Did you have any license before in other industries?
A. Yes. I was licensed -- first I was a licensed sales agent -- real estate agent.
Q. Right.
A. From 1991 to 1997. In 1997, I became a broker. I had my own office, which I closed in 2003, when I decided to do appraisal exclusively.
Q. What happened to that broker license?
A. I surrendered that license because I had -- one of the requirements is that you have to keep an office as a broker. I had no use to keep a real estate office anymore. So, I stored everything, all the records in storage. I put them in storage and I closed my office.
Now, about in 2006, I believe, I was audited -- since

I didn't surrender the license, the broker's license, I was audited and those records, I didn't have access to them at the time, and instead of going through the issues of -- because I didn't have an office, I was advised to just surrender the license because I was not operating as a real estate broker anymore.

Q. And that's what you did?

A. That's what I did.

Q. Surrendered your license?

A. Yes.

Q. Just to wrap this up, Mr. Mompremier, again, what is your overall conclusion as to the fair market value of this property at the time the bankruptcy was filed on August 29, 2011?

A. My opinion of the market value is 225,000. Let me -- if I may add, we also have an additional form. That's on page -- at the top of Page 5 -- 6 of 30. The first sentence reads: There are 13 comparable properties currently offered for similar subject neighborhood, and it gives you the range of asking prices in that area, at the time, on January 3rd, from 70,000 to 449,000. There were in the previous 12 months -- the next sentence, the previous 12 months there was 13 sales and the range of sales was from $53,000 to $250,000. Our estimated value is within that range.

MR. KOURI: Thank you.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MS. GARCIA:

Q. Good afternoon, Mr. Mompremier.

A. Good afternoon. How are you?

Q. Good. Thank you.

You mentioned that your company's name is Deluxe Appraisal Services, correct?

A. That's correct.

Q. Okay. Is this a corporation with the State of Florida?

A. That's a d/b/a for Pro Realty. That's the previous real estate office that I had. At the time when I formed -- when I was -- when I started doing the appraisal exclusively I still had the real estate office. So, what I did, I formed the appraisal company as a subsidiary of the real estate office.

Q. And the name of the real estate office again is?

A. Pro Realty & Associates.

Q. So, Deluxe Appraisal Services you would say is a registered fictitious name?

A. Yes.

Q. Okay. Is this fictitious name active right now?

A. Yes, it is.

Q. The State of Florida shows that that fictitious name

expired on December 31st of 2010. Do you think you may have not renewed the fictitious name?

A. That's possible. It may be an oversight. It was filed for five years, I believe. So, that is possible. That could be an oversight. However, may I add that -- may I add?

Q. That's good. Thank you. And I'm not going to repeat the questions Mr. Kouri asked you so we can bring an end to this.

How many appraisals have you conducted in the area of Hialeah, Florida?

A. I don't have ---

Q. In that specific area. An approximate number.

A. Oh, I'd say -- I'd say anywhere in the neighborhood of 300 maybe in the last -- since I've been active in real estate.

Q. Is conducting real estate appraisals your full-time job and your primary source?

A. Yes.

Q. Do you have any other corporations or businesses that you engage in?

A. Not actively. My wife has a company. She put my name in there as one of the directors, but I'm not involved in the operation of the -- my dad may have my name -- used to have, I don't know if he still has, in his business. That doesn't mean I'm active.

Q. The State of Florida shows 21 corporations ranging from body shops to properties and these have your name on them. Your testimony is that these might be your father?

A. Well, we have a close family. If they need help, sometimes I -- you know, if they put my name in there, that doesn't mean I'm active in the company. I help. As a matter of fact, any time my dad needs something I'm the first person he calls.

Q. Mr. Mompremier -- Mompremier?

A. Yes.

Q. Okay. Perfect. If you would you, please, turn to Page 3 of your appraisal in the comparable sales?

A. You said Page 3?

Q. Page 3. Oh, mine says Page 3 at the bottom.

A. If it's the comparable, that would be Page 6 of 30.

Q. You see, I have 7 of 31 with what I received. We'll go with 6 of 30. I believe that ---

Okay. Can you explain to me why the Comparable Sale 1 and 2 have "not available" next to them, days on the market?

A. 1 and 2?

Q. Yes. Comparable Sales 1 and 2.

A. 1 does not have days on the market because there was no information regarding that on the MLS.

Q. So, these were not MLS listings?

A. No.

Q. In your professional opinion, you noted during your testimony to Mr. Kouri that you saw the sales that took place on Comp Number 1 of yours for $90,000 previous to your transaction that you used where it sold for $215,000. Can you explain the difference of the 90 to when it actually sold -- to the next sales price of 215,000?

A. Yes. The MLS clearly stated that the property at the time when it sold for $90,000 was an REO. That is a foreclosure property. That is a property that was seized by the bank through foreclosure and may have been vandalized and the bank is just trying to liquidate the property. That's what is called a liquidation value. There's different value in real estate. There's liquidation value. There's market value. There's assets value. What we are looking for is not a liquidation value. We are looking for a market value.

Now, when the bank has an inventory of 50,000 properties in the area, they want to get rid of them, they sell it at any price, especially if the property is exposed, there's nobody living there, kids are breaking the windows, you have people stealing copper from the AC units, you have people stealing the cabinets for -- to do work in their house. The bank is trying to get rid of the property. So, they sell it at the most -- any price they can get.

Now, when the property is repaired by you -- by people like you and I, we, especially in the case of a

multi-unit, those people are investors, they buy the property at a low price, spend their money to rehabilitate -- to renovate the property and fix it up. They're not going to sell it at $90,000 again.

Q. Okay. So, let me ask you: How do you know that the prior sale at 90,000 was the bank -- was from the bank?

A. Because it says so right in the MLS.

Q. Okay. And how do you know the condition it was in?

A. Everything is on the MLS, right here, and there's some pictures also attached. I don't have those pictures with me.

Q. And how do you know that the conditions of the property were fixed prior to the sale for the 215?

A. We visit the property. We take pictures of the property, and before the MLS listing, I actually call the realtors to verify the condition of the property.

Q. Who did you verify -- I'm sorry.

A. I don't have the name of the person that I verified with, but the information is there on the MLS. The specific question that we ask is what was the condition of the sale. Because sometimes they might sell a property, what we call concession. The sale is concession. We have to ask about those also. Let's say I sell you a property for $95,000, but I give you $5,000 to fix the property or do whatever. So, that has to be deducted -- per Fannie Mae guideline, NFHS

guideline that has to be deducted from the sales price.

The next question that we ask is about the condition of the property. Did it need repairs? In your estimation, as the realtor that actually sold the property, how much would you estimate the amount of repair that's needed to the property?

Q. Did you go inside the property Number 1 that you are making mention here?

A. At the time of the foreclosure sale?

Q. No. During your -- you noted right now that you visited the property and took pictures.

A. On the ---

Q. Were you privy to the inside of the property?

A. No. We do exterior inspection. We can't go into somebody's property. We do exterior observation.

Q. Okay.

A. That's noted on the appraisal.

Q. Can you now turn your attention to Comparable Number 3?

A. Yes, I may.

Q. Okay. And did you verify the sale with the realtor?

A. Yes, I did.

Q. Okay.

A. And we have documentation that the actual -- that was the actual sales price. I can give you the document -- the

recording document number for the sale.

Q. Who was the realtor that you verified this with?

A. If I may? You said Sale Number 2 -- 3, right?

Q. Number 2. Yes.

A. It was the listing agent, Annabelle Gonzalez.

Q. Annabelle Gonzalez?

A. Yes.

Q. And did she say anything -- any improvements had been made to the property to deem the increase once again?

A. Yes. The property was resold -- was sold for 235 on November 30th, 2010.

Q. And you have Annabelle Gonzalez as the realtor?

A. It was -- yes, as the listing agent.

Q. Okay. Do you know who Ileana Salman is?

A. Anna Salman was the previous realtor on the property, I believe. I can check. Because the property was sold first on November 20 -- I mean, on October 26, 2010. It was a foreclosure sale as the information and it specifically says that it was sold on October 26 and recorded the same day.

Q. How much was it sold for in October 2010?

A. $110,000.

Q. And that was with, you're saying, Ms. Ileana Salman?

A. I don't have -- for some reason I don't have the MLS printout here for that one.

Q. Okay. And then you say it sold again when?

A. It sold again on November 26 for $235,000.
Q. November 26, 2010?
A. Yes.
Q. For how much?
A. $235,000. It was a conventional mortgage -- it had a conventional mortgage.
Q. So, one month later --
A. Uh-huh.
Q. -- from the bank selling it it sold at a profit of over $100,000 with no improvements or nothing major done to it in one month's time?
A. You said no improvement. I don't know that.
Q. I asked you ---
A. All I know is that they had -- they purchased it as a foreclosure property. They improved it and sold it. I also do appraisals for ---
Q. Wait. Let's stop right there. I actually asked you if you had spoken -- you indicated you had spoken with Ms. Annabelle Gonzalez and I asked you, and I'll ask you again, just so the record is clear, when you spoke with Ms. Gonzalez did you ask her if any improvements had been made on the property?
A. Yes, I did.
Q. Okay. And what improvements were made on the property that warranted such a huge increase in value within

one month's time?

A. I don't know because Ms. Annabelle is the listing agent. The listing agent may not know all the repairs that were done to the property.

Q. Just give me some that she told you from your notes that -- anything that she told you that would have substantiated $100,000 increase in the value of that property within one month's time.

A. I don't have that information. She didn't tell me what -- she didn't tell me. I'm not sure she knows all the improvement. What I asked is what's the condition of the property at the time of the sale. She told me there's no repair. It's been renovated. I don't need to go into the detail of all the renovation that was done.

Q. So, for the record, you don't have the exact information as to what renovations were done in the property?

A. No. I don't have that information.

Q. Okay. You said this was a conventional mortgage, correct?

A. Yes.

Q. Is there any -- did you research any -- did you research to find the recording of that mortgage with Miami-Dade County?

A. The recording of the mortgage?

Q. Yes.

A. No, I don't have the information for the recording of the mortgage. I have the -- I have one from the database, from Collateral DNA, that the mortgage was provided -- it was a conventional mortgage. I don't have the name of the lender here.

Q. But there's no verification that it was recorded or there was an actual mortgage recorded? In your examination you did not find a recorded mortgage?

A. This is not the responsibility of the realtor to research all the mortgage on the property. Our responsibility is to research the sales, to verify that the transaction actually took place. Let's say, for instance, that I get a private lender. They may not record the mortgage on time. That information would not be on the record, but the transaction did occur.

Q. Fair enough, but ---

A. The question is whether or not the transaction occurred.

Q. Fair enough, but this is -- you're noting that this is a conventional mortgage.

A. That's what I have right here.

Q. But a conventional mortgage would have a mortgage and it would have to be recorded with the Miami-Dade Clerk of Court.

A. At the time that I ---

Q. And there is nothing that shows that this -- nothing in our research shows that this mortgage was recorded. Do you have any ---

THE COURT: Are you testifying or are you asking him a question?

MS. GARCIA: I'm sorry. Let me restate.

BY MS. GARCIA:

Q. Did your research produce any recorded mortgage?

A. At the time ---

Q. Just yes or no?

A. At the time I did the research there was no information about the recording of the mortgage.

Q. Okay. You noted that the property is located in a declining market, correct?

A. That's correct.

Q. Then how do you explain, once again, and I'm going to go through each of them, in Comp Number 2, how it increased within 30 days over $100,000, in a declining market, with no improvements to which you know of that would have caused a greater increase in the value of the property? How do you account for that?

A. Let's say that -- would you allow me to use an example?

Q. Go ahead.

A. Let's say I have to get rid of my car. I'm moving

and I need to get rid of my car and I say, you give me $500 for my car. That's what I sell it to you for. That's not the value of the car. Now, you can turn around the next day and sell the car for the actual value.

Q. So, you're saying these were sold just to get them off the bank's book?

A. If the property sold below market, for a low price, even if it's not in bad condition, the owner, the new owner has the right to sell it the next day for more money. There's nothing illegal about that.

Q. And in Hialeah, within a year's period, in your examination, what was the average sales price -- or let me strike that.

The average property sold in Hialeah within the year of this appraisal being conducted, were they conventional sales or were they mostly foreclosure REO sales?

A. You lost me when you said the average price.

Q. The average sales that took place in the city of Hialeah within a year of this appraisal being done, were they conventional sales or ---

A. You mean a typical sale?

Q. A typical sale or was it people purchasing REOs or foreclosure sales?

MR. KOURI: I'm going to object to the form of the question because she's not limiting it to a specific area.

She's saying entirely Hialeah. Is she limiting it to the ZIP code of this particular address or does she want all of the sales that have occurred in a year's time for all of Hialeah? Also, what time period is she ---

THE COURT: Well, if the witness can answer. Overrule the objection. If he can answer, he can answer.

As you point out, if it's all of the United States, it's not as probative as Florida; and if it's all of Florida, it's not as probative of Hialeah, and if it's all of Hialeah, it's not as probative as the ZIP code, but she asked the question. That's her right.

Can you answer the question, sir?

MS. GARCIA: Your Honor, if I may clarify for Mr. Mompremier?

BY MS. GARCIA:

Q. Let's limit it to the ZIP code area of the property -- of the subject property.

A. The typical sale was foreclosed property because -- if you want me to elaborate?

Q. Would that be the inventory that was mostly available to individuals in that area? Would foreclosed properties be -- REOs, foreclosure properties be the majority of the inventory within that ZIP code of the subject property?

A. Comparable to the subject we had only 13 sales in that area in the last 12 months. In the previous 12 months of

the August 29th we had 13 sales. Most of those sales were foreclosed properties. However, we were not appraising a foreclosed property. We were appraising an average condition property that was in livable condition, where the owner was living there, there was no repairs needed. So, there was no reason for me to use foreclosed property as comparable for that one. I used typical, average condition property.

Now, if I was appraising a foreclosed property for a bank, I would use a comparable that is in similar conditions as it is, because they key thing here is the condition of the property, using apples to compare to apples and oranges to oranges.

Q. But by that same analogy, why would anyone walking into the area code where this property -- the subject property sits, pay over 225,000, 250 for a property when everything around them is selling for 90 to $100,000?

A. Let me direct your attention to the market report. There was 13 sales in the area ranging from $53,000 to 250. Somebody paid $250,000 for a property and we have at least, at least, three properties that was sold more than -- for more price than $200,000.

Q. And did you visit those properties or -- did you visit those three properties that you mentioned that sold for more than 250 ---

A. What do you mean by visit the properties?

Q. Are you privy to the condition of the property -- are you privy to the condition of those properties that sold for over 250,000?

A. Yes, I am. From the exterior I saw the property. I photographed the pictures. Now, as far as the description inside -- the condition inside the property, I have the information that I gathered from the MLS and from some other -- in some cases, people that are living in the property, because we're talking about multi-units. Sometimes when you go inspect a property you might see somebody outside. "Do you live there," and they say yes. "How's the property?" They tell you what the condition is.

Those are the guidelines as far as Fannie Mae is concerned.

Q. Would Fannie Mae allow you to present an appraisal like the one you presented today?

A. Yes.

Q. They would not require you to have verifiable MLS listings?

A. I do have verifiable listings. Now, MLS is only one database, one source of information. It's not the only source of information.

Q. Which is the main database that most lenders ask you to have?

A. Public records.

Q. Public records?

A. Public records, then the MLS, and then any other database that you can have, and if I may add ---

Q. So, you would have checked the public records?

A. Yes, I did. If I may add, in the appraisal that was submitted by your office the public record is listed as the source of database also.

MS. GARCIA: Give me one moment, Your Honor.

BY MS. GARCIA:

Q. Can you turn to -- let me find the correct page. I apologize. Can you turn to Page 6, where you do your comparables, where you do the subject property and the adjustments?

A. Yes.

Q. Okay.

THE COURT: That's 6 of 30 as opposed to 6 of 7; is that right?

THE WITNESS: 6 of 30.

MS. GARCIA: And I apologize. It's actually Page 7 -- for reason some, Your Honor, my ECF papers say 7 of 31. It's Page 3 of 7 of your appraisal report. On the bottom it says Page 3 of 7.

THE COURT: And on the top it says 6 of 30; doesn't it?

MS. GARCIA: Mine says 7 of 31.

MR. KOURI: Mine says 6 of 30 as well.

MS. GARCIA: This is what I received and it says 7 of 31. I apologize for the confusion.

THE COURT: Okay.

MR. KOURI: If I may approach, Your Honor, and I'll pull this over here?

BY MS. GARCIA:

Q. You noted -- according to your land adjustment -- I'm sorry. Let me rephrase.

What would the land adjustment that you suggest of $1.25 on your Comparable Number 1 to the lot signify to the value of the land itself?

A. The subject site is 8,100 square feet. The Comp Number 1 is 6,450. When you subtract -- if you subtract the comparable 6,450 from 8,100, the difference is multiplied by the factor to arrive at that figure. I believe it's -- in this case I believe it's a $1.25; is it?

Q. Correct. That's what you noted.

A. Yes.

Q. If I multiply those numbers, wouldn't that mean that the -- would that mean that the site -- the land in and of itself is worth -- in and of itself, about $10,000, plus or minus; $1.25 times the difference that you noted right now?

A. No. We're talking about two different values.

Q. Okay. Explain to me what impact it would have.

A. What do you mean by what impact?
Q. What would be the ultimate amount -- what would be the value of this land based -- when you take these adjustments into consideration?
A. This is the context of the sales -- of the sales comparable.
Q. So, what would it mean right here? What would be the value of the site -- or the Comparable Number 1?
A. You can multiply -- you can multiply by the site and give you -- that's for the purpose of reconciling the sales -- in the sales.
Q. So, if I multiplied $1.25 times the difference between 6450, which is the subject property square foot -- I'm sorry -- the 8100 and 6450, which is the square footage of the Comparable Number 1 --
A. Comparable Number 1.
Q. -- we get about 1750 square feet approximately? We multiply that by $1.25, correct?
A. You're talking about 6,450 minus -- I mean, 8100 minus 6450?
Q. Correct.
A. Yeah. It's rounded to $2100.
Q. So, what would be the -- so, that land in and of itself would be worth -- the equivalent of about $10,000?
A. The land itself?

Q. The land itself, based on -- just here, in this formula, not the whole thing, just right there.
A. For market value?
Q. For what you are indicating here is a comparable sale ---
A. No. Are we talking about market value?
Q. I'm talking about -- yes.
A. That would not be the market value.
Q. What would be the market value?
A. There's no place in Dade County you can find an 8,000 square feet property for sale for 10,000.
Q. So, then why would anybody pay a $1.25 more per foot?
A. That's just ---
Q. Do you think that adjustment is actually necessary?
A. That's just an adjustment.
Q. But is that adjustment necessary?
A. Yes, it is -- it is customary. The lender require that you do adjustments for the differences in the property.
Q. So, it's customary, but not necessary?
A. Yes. Yes, it's customary. Yes.
Q. Okay. Does an active listing equal a sale?
A. No.
Q. Does it have any -- does the property have any value until it's sold?
A. No. It has value. We don't know the market value.

Q. Market value. I'm sorry. Thank you for bringing that up.

So, those properties you mentioned that were active listings at a higher amount, over 200,000, were not actual sales?

A. No. That was requested by the lender. They asked me to provide some listings -- some current listings and I did. And if you -- that has no impact on the actual -- the estimated value -- the final conclusion that we have. Those I provided just for illustration purposes.

Q. What was the lowest value that you found out there when you were searching for comparables?

A. I refer you to Page 6 of 30, the second line, $53,000.

Q. 53?

A. Yes.

Q. And the median?

A. The median, you would have to go to the market condition form. That would be Page 15 of 30 in my report. The first -- the second block. We don't have one for the year because this form required that we break it down 7 to 12 months, four to six months, current to three months. The current to three months -- I don't know if you found -- you found it?

Q. Uh-huh.

A. The median comparable sale price for current to three months was 80,177.

MS. GARCIA: Okay. Thank you.

Your Honor, I've concluded my cross of Mr. Mompremier.

Thank you, Mr. Mompremier.

THE WITNESS: You're welcome.

THE COURT: Very well. Anything further?

MR. KOURI: Very briefly.

REDIRECT EXAMINATION

BY MR. KOURI:

Q. Staying on that same page, Page 15 of 30, what was the median sale price for months four to six?

A. Oh, one second. Let me go back to that page. Four to six? That was 133,250.

Q. And the median sale price for months 7 to 12?

A. 160.

Q. Going back to your Page 5, there was a lot of cross-examination concerning the prior sale on Comparable 3, correct?

A. Yes.

Q. And what was the sale price -- the prior sale price on Comparable Number 3?

A. The prior sales price? $110,000.

MR. KOURI: No further questions.

THE COURT: Very well. Thank you, sir. You may step down.

THE WITNESS: Thank you.

(Thereupon, the witness was excused.)

THE COURT: Okay. I would like to commend both appraisers for their presentations. They were both well presented.

What doesn't work out is the disparity between the numbers. Normally, we get about a 10 percent difference. I believe we got a little more than 10 percent here today.

MR. KOURI: That's correct.

THE COURT: I'm going to have to ask you to prepare proposed memorandum decisions in which each of you will, in your memorandum decision, refer to the testimony and the appraisal reports, et cetera, in supporting why the Court should arrive at a number and the Court will choose one of your opinions and insert a number after I have a chance to re-review both of these reports.

I think I have some comprehension of perhaps the basis for the wide disparity as opposed to the normal 10 percent differential, but it would seem to me that from what I heard in opening here, that there's $104,000 mortgage on the property; and so, if the property is worth less than 104,000, then the second mortgage can be stripped, and if it isn't worth less, if it's worth more than $104,000, then it can't.

Is that the way you folks see it?
MR. KOURI: That's correct, Your Honor.
MS. GARCIA: Yes, Your Honor.
THE COURT: In any event, interesting case. Thank you for your presentations and how much time do you need to get your orders in?
MR. KOURI: I'd ask for at least 30 days because we have to order the appraisal -- I'm sorry. We have to order the transcript.
THE COURT: Is it really worth ordering the transcript?
MR. KOURI: It's tough to remember everything that was said and then cite to it.
MS. GARCIA: And, Your Honor, if Mr. Kouri doesn't mind, I would like the Court to give us a little more than 30. I am taking my son on his spring break that's coming up ---
THE COURT: Where is he going?
MR. GARCIA: We're going to take him to Puerto Rico for his birthday and for spring break. So, I would like to not have the stress of having to write this before I leave.
THE COURT: Nice. So ---
MS. GARCIA: 45 days perhaps?
MR. KOURI: 45 days.
THE COURT: Okay. Then 45 days would be about ---
MS. GARCIA: Thank you so much.

THE COURT: Let's see. Today is the 21st. So, let's see. We can't do 45 days. We have to do either 42 or 49.

MR. KOURI: Let's take 49.

MS. GARCIA: 49.

THE COURT: Okay. 7, 14, 21, 28, 35, 42, 49. Looks like the 9th of May.

MS. GARCIA: Perfect.

MR. KOURI: Thank you, Your Honor.

If I may approach and substitute this original binder for the one that you have, Your Honor?

THE COURT: That's this for this?

MR. KOURI: Yes. Because that's our original.

THE COURT: Oh, and you want this back.

MR. KOURI: Thank you.

THE COURT: Okay. Very well. Thank you all.

(Thereupon, the hearing was concluded.)

CERTIFICATE

STATE OF FLORIDA)
COUNTY OF DADE)

I, the undersigned, do hereby certify that the foregoing is a true and correct transcription of my stenographic notes of the proceedings had and taken at the time and place herein set forth.

DATED at Miami, Dade County, Florida on this 12th of April, 2012.

MAGGIE RUBIO
Court Reporter